Before we get going, you know, we've got these cases consolidated, so I'd like to know how you're going to divide up your time, how you would like to divide up your time. Our intent for appellant is I will argue for 10 minutes on both cases, and then my colleague Mark Kimball will argue reply for 5 minutes. Okay, are you going to try to save any time for rebuttal? Your Honor, the rebuttal would be what I would be arguing, and... Oh I see, so you're going to do the rebuttal. Yes. I understand. Sorry. Okay, so you're going to have a 10 minute argument, they're going to argue, then you're going to do your 5 minutes. Is that correct? If it's even as low as 3 minutes, that's fine. No, no, no, that's fine. I mean, I just want to know basically how we're going to go. So that's what we'll do. We'll start with your 10 minutes, then we'll hear from the state and the people they're representing individually, and then we'll come back to you. I think, Your Honor, if Mr. Ware needs an extra couple of minutes to go to 12 minutes, that's fine. It always happens that way, because when people try to divide these things exactly, when you're talking about lawyers, they're like cats, you know, they don't stay in the right way. Problem comes in that if he takes 15. All right. Do my best. Exactly. Very well. I can't be in your office, I don't care. Okay. All right. Please proceed. We got you now. So if it may please the Court, my name is James Ware. I'm here with my colleague, Mark Kimball. We're here on behalf of Appellant, as the Court noted in the consolidated cases. The primary issue here, Your Honor, in these cases is whether or not Sarah Ose and Jeremy Kirkland were deliberately indifferent towards actions that led to the death of a five-year-old child, GB. The record here is unfortunately grim, but we understand it's deliberately indifferent, counsel, and I look at Case v. Kitsap, County Sheriff Department, and it says a mere violation of policy does not equate to deliberate indifference. So we don't have that being the deliberate indifference. So what is the deliberate indifference here? Here Your Honor, the deliberate indifference is the knowledge that GB was left in an unvetted home many miles away from his social worker without any local services. The start looking at Mr. Kirkland, for example, and Mr. Can I start with Kirkland? Well, I can start with Ms. Ose if you would prefer. Well, no, I'm just trying to get my notes in front of me so that if you're going to talk about Kirkland, I got it dead set right here. So just so that we can focus on Kirkland, do you agree that with respect to, how do you say it, Ose, is that the way it's supposed to be said? Yes, that's my understanding. Okay, with respect to Mr. Ose, he didn't supervise Khalil at the time that much of this occurred. Your argument seems to be that because he didn't follow the policies that that was enough. My colleague has pointed out there is a case that says that is enough, I mean, it isn't enough because not following a policy doesn't constitute deliberate indifference. So basically, are we leaving Ose behind on this now we're going to Kirkland? Are you still claiming that Mr. Ose is potentially liable, not under state law, but under the law you're suing under here? With respect to Sarah Ose, it is our position that Ms. Ose was deliberately indifferent because at the time she was supervising Heidi Kass, she had actual knowledge that this child was going to be placed in a home without first establishing a home study and without first establishing courtesy supervision. But those are all policy decisions and my focus, Ose's case, be kitsap, the focus is not whether a reasonable social worker would have known that it violated the policy. It is that it violates a statute or a constitutional right. So what statute did that violate? Well our position is that it violated really his constitutional right, if you're looking at Tomas, to be placed in a home or to have a home in which he is free from harm. I can understand free from harm, that's general, but it's my understanding, looking at Ose, he speaks with Khalil, I don't know why you say that that way, I did, about being the permanent placement. He allows for a week's visit in Port Angeles. After moving to Chattaroy, they offered to be the, she offered to be the permanent placement. Kass conducted a walk through Khalil's home, found it suitable. The court ordered the extended stay and his supervision ended. It is our position that trying to frame this as an urgent placement placed GB in a substantially obviously risk of harm because he was stepping into an unvetted home. That goes back to the policy point made by my colleague, does it not? There's no statute that says that he had to do that. A court approved the placement. All the things my colleague talked about that he did, but it seems that you're saying that because the general policy is such and such that there's a problem. Is that a fair statement? Well, one mandate of DSHS is to ensure the health and safety of children within its care and that is statutory. It's RCW 74-13-010 and RCW 13-34. That's a pretty high level, is it not, to have specific indifference? What statute would you refer to that meets the facts of this case with respect to, it's Ms. Ose, right? Correct, Sarah Ose. What statute do you have that meets the requirements there? I believe that looking at the totality of it, that again, the child has a constitutional right to be free from harm and placing, my position would be placing a child into an unvetted home. It wasn't unvetted. There was no home study done. Well, no home study done, but Kass conducted a walk-through through the home, found it suitable. I don't know that Kass is his name, K-A-S-S. Heidi Kass, I think is how you pronounce it. Kass conducted the walk-through through the home, found it suitable. Then after the walk-through, this is from July, when Khalil offered to be the permanent placement in July 2014, then Kass conducted the walk-through, found it suitable, and immediately, August 2014, the court ordered the extended stay with the permission of the tribe. I would also note that in the record that the court in September, actually in August. If we're talking about September, we're moving into Kirklands. Well, I was going to point out that the court in August had actually made comments that it was concerned of the hastily done nature of putting GB into this extended stay. Whatever the court said, it ordered that this would be fine, and not only that, but the tribe agreed. Well, then I think the appropriate thing to do is to move on to look at Mr. Kirkland. Okay. Just so you know, you're down to three minutes and 15 seconds. I'm eyeing it. It's entirely up to you, but your partner over there is just twitching. He's just about to have an office party with you. I understand. Okay, so looking at Mr. Kirkland, so Mr. Kirkland steps in in early September. GB has been placed at this time. Mr. Kirkland has testified that he knows that no courtesy supervision has been established. Mr. Kirkland states that he knows that there's no home study being performed. And in late October, early September, is the first signs that Ms. Kass is actually falsifying records of her health and safety visits. This is a health and safety visit. This is the only time that anyone is actually seeing GB. I believe that that knowledge, if you look at the admissible statements of Dr. Burns, that knowledge is something that a reasonable official would have been compelled to draw an inference that GB. But correct me if I'm wrong. I thought when that knowledge came through that prompt action was taken. That is in. Several different things were done to check it out and to get her totally off the case, et cetera. Am I wrong? What occurred was is that she was taken off the case. A new social worker was put in place. But there was no home study. There was no courtesy supervision. That did not actually occur until a mandatory reporter in December of 2014 reported. And this was a staff at his school made a report to CPS. That was the first time that Spokane actually had knowledge that GB was actually within their geographic region. That was the first time that anyone set up courtesy supervision. And that was the first time that anyone even contemplated starting a home study. And that was Steiner, right? Correct. In 2014, December. That's correct. And that was as soon as Steiner was reassigned in December 2014, immediately he started and thereafter conducted regular health and safety visits at least once per month and sometimes more. He never had a concern about GB's safety. He requested the courtesy supervision for Spokane. He ensured a home study would be done. Vance did a health and safety visit. Desmond commenced the home study, expressed concerns about being able to do it because there were too many children. But nothing about GB's safety. Nothing about GB's safety in Vance's safety visit. Nothing. The issue here, Your Honor, is that ultimately had courtesy supervision been requested in a timely fashion, a series of events would have occurred, one of which would have been this home study. The home study would have actually then been completed prior to GB's death. The record indicates very clearly that Mr. Desmond said that Ms. Calillo was not going to pass, or did not pass the home study, and had also stated that even if Ms. GB had not passed away, she would not have passed the home study. The reason that is relevant, Your Honor, is that even if we assume this is an urgent placement, if you read the internal workings regarding urgent placement in a home study, the purpose of the home study is to make sure, and no one disputes this, that it's a safe home, and that you can later decide is this going to be the grade for continuous stay. I think you have your point. We've let you go a little bit over time, but thank you very much for your argument. Thank you, Your Honors. Let's hear from the State. Are you dividing your time, or what's the deal? No, Your Honors. I'll be arguing for the entirety. And he won't be upset with you or anything, right? Not at all. Okay. May it please the Court, Assistant Attorney General Sarah Cassidy, on behalf of Defendant Appellees Sarah Oss and Jeremy Kirkland. Supervisors Oss and Kirkland are each entitled to qualified immunity for three reasons. First, neither Oss nor Kirkland was deliberately indifferent to GB's liberty, interest, and social worker supervision and protection under Tomas v. DSHS. Second, no law clearly established that a purported violation of DSHS policy would violate GB's liberty interest under Tomas, and as Your Honor has correctly pointed out, there's law to the contrary, that a policy violation does not arise to the level of a constitutional violation. And third, neither Oss nor Kirkland personally participated in the alleged deprivation of GB's liberty interest. I'd like to begin with deliberate indifference, speaking briefly as to Oss, and then turning the attention to Kirkland. Plaintiff has to show that not only was there an objectively substantial risk of serious harm to GB, but also that Oss was subjectively aware of facts from which such an inference could be drawn, and at no time during her supervision until August 30th were there any such facts that there was an objectively substantial risk of harm to GB. A background check was completed on Ms. Khalil. It revealed no criminal history and no founded findings of abuse or neglect. Ms. Oss had supervisory meetings with Ms. Cass in May, June, July, and her deposition testimony, she states that during those meetings, she would discuss GB's well-being, safety, permanency, the overall plan for the child. She was supervising. The dependency court approved an extended visit with Ms. Khalil on August 1, with the support, as Your Honor noted, the Ho tribe, as well as the court-appointed CASA. And then during the month of August, while GB was in Ms. Khalil's home, no collaterals, no mandatory reporters ever reported there being any issue in the home. And then Ms. Oss was no longer the supervisor after August 30th. So it does not meet the standard of deliberate indifference. Whose responsibility is it to call for the courtesy supervision in the home study? It's the caseworker, Your Honor, which would have been Ms. Cass in this case. And courtesy supervision, Ms. Cass actually did call for courtesy supervision in December. There's testimony in the record related to that. And courtesy supervision was received by Spokane on December 23rd of 2014. That request, it was approved and was going to be assigned out. The second social worker who was GB's caseworker, Ms. Steiner, she also requested courtesy supervision in January, I believe, of 2015, as well as the home study. That home study was initiated January 27th of 2015. So eyes were being put on this child. I'd like to talk a little bit about Kirkland. Let me ask you a question before you get to that. Assume that we would decide that the violation of the policy, no courtesy supervision in setting up the home study, is a violation. Is there any evidence, objective evidence, of serious harm to GB? There is objective evidence that the district court cites in the record related to October and November as to some bruising. This was submitted related to the Riverside School District summary judgment. But none of those facts were known to the social workers. And certainly when December 12th, the CPS referral came in, and the Spokane office investigated it, that was closed as unfounded. So there was no obvious risk of serious harm to GB at that time. What's the status of other litigation involving the death of this child? I know there's this lawsuit against the school officials. Maybe you can fill in the gaps here. Sure. So there are claims against the school and the school officials under 1983. They were denied qualified immunity, as this court affirmed previously. So that will be handled on remand, as well as negligence claims. There are also negligence state claims being brought against DSHS and DSHS social workers that will also be handled once this appeal has concluded related to the death of this child. And that's an important distinction. The standard here for deliberate indifference is a high standard. It is not negligence. It is not gross negligence. I'd like to point the court to the Patel case, which was cited in the Riverside School District by Judge Callahan, I believe, in dissent, which talks about it's talking about deliberate indifference. And it notes that there has to be a culpable mental state where a defendant knows that something is going to happen and ignores that risk. These social work supervisors did not know that anything was going to happen imminently to GB. They did not ignore GB. Kirkland, when he took over on September of 2014, he had his first supervisory meeting with Ms. Cass the day after the dependency court had placed the child in Ms. Khalil's home. Until that time, he did not know that GB was on her caseload. He never met GB. He met with her like he does all of his social workers. I believe he testified. I'm following up with another question I ask you because I ask you whose responsibility it was. And it seems to me that your argument takes you there. But does Sarah, and I call her Sarah because I can't pronounce the last name, and Kirkland, do they have any personal responsibility with each of these policies at issue? Under the policy that was applicable, I don't believe they do. Plaintiff is relying on policy 4431, which does not apply in this type of placement, which is a relative placement, which by definition under policy 4527, excuse me, I'm getting the numbers confused, but there's a special policy 45274. It's an urgent placement. You don't have a timeline for courtesy supervision at the time in 2014. Subsequent to this, there was a change to that policy requiring about 72 hours to make the request. But as your Honor noted during Appellant's argument, policies are immaterial to the question of deliberate indifference, to the question of the right this child had, a liberty interest right, and social worker supervision and protection. And there's no clearly established law that would have alerted either of these social work supervisors that failing to institute a home study or failing to institute courtesy supervision in any particular point of time would have amounted to a violation of that child's liberty interest. And at the end of the day, both were instituted in, again, January. First the courtesy supervision was accepted in December, but then the home study in January. As to Kirkland, he did become aware at a certain point that Ms. Kass, her October visit note called into question whether she had actually performed that. She was a 15-year social worker. He approached her. He didn't ignore his suspicion. He asked her about that note, and she gave a reasonable explanation that she just missed the documentation. She had gone on a weekend. It wasn't until later, and his deposition testimony identifies the end of October, where he was approached by a foster parent juvenile litigator who gave him information that Ms. Kass appeared to have been disingenuous in her testimony to another dependency court in a different matter. That caused him then to do an in-depth review of all of her cases. He acted promptly on that. It took some time. But then by November or December, he was elevating the issue to his area administrator. He had reconfronted Ms. Kass, and she had admitted to him, per his testimony, that she had falsified the October note. In Mr. Kirkland's deposition testimony, he testified that he did not know. He had not connected the dots that the November visit had a problem with it. So, again, he had no facts that this child had not been seen. It wasn't obvious. The notes are very detailed that the child had not been seen. And he also testified he was aware that the child was coming back to Port Angeles in December of 2014, on December 5. And that's also reflected in some of Ms. Kass's social work notes. So the child was not being ignored. There was no deliberate indifference. And for that reason, qualified immunity should remain in place for both him and Ms. Ose. I've already touched briefly on the fact – yes, Your Honor? If the policies were violated, and now we're just looking at the acts of the supervisors having policies violated, why isn't that a jury issue as to whether that's deliberate indifference? It is because there's no question of fact underlying that. Whether it's gross negligence or deliberate indifference is this Court's role, because qualified immunity is immunity from suit, not just immunity from liability. Qualified immunity as a doctrine, as I'm sure this Court is aware, is to allow government officials to undertake discretionary acts and act reasonably. And so it is for this Court to determine whether that – if there was a violation of policy, whether that violation arises to deliberate indifference or not. Whether it also may be negligence will be handled on remand following this Court's disposition. Lastly, neither Ose nor Kirkland personally participated in either of the alleged deprivations. Under Ashcroft v. Iqbal, as well as this Court's decision in Taylor v. List, there needed to be some personal participation, either directing the violation, failing to prevent it. In Taylor, for example, one of the supervisors had personally acted to prevent an incarcerated individual from having access to law books or law clerks. That didn't happen here. But are you suggesting that the plaintiffs in this case are making their arguments about other than Sarah's and Kirkland's personal actions? It seems to me they're only concentrating on the personal actions here. They're concentrating on what the supervisors allegedly failed to do. What they did or they failed to do. We're not talking about what their agents failed to do or didn't do. Correct, but the – what – That's why I didn't know why Ashcroft v. Iqbal really had anything to do with this. We're only talking about the supervisors' actions in this case. Well, and whether those supervisors' actions reach far enough into whether there was a constitutional violation, I think that's the issue here, is that they don't reach far enough to be directly involved in the alleged constitutional violation. Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law under Malley. There's no evidence that Defendant Oss or Kirkland did either. And so we would ask that – So for our purposes, getting back to my colleague's question, because this is a 1983 constitutional question, we deal with a different issue than, say, what a state trial court might deal with and a jury about whether there was negligence involved. Is that correct? Absolutely, Your Honor, that's correct. And, again, looking at the constitutional question, the liberty interest, and what deliberate indifference would be to that liberty interest, there just aren't facts to support that either Supervisor Oss or Supervisor Kirkland were deliberately indifferent to GB's interests under clearly established law. So we'd ask that the Court affirm, unless there are additional questions, I'll yield the remainder of my time. Other questions? No. I think not. Thank you very much. Thanks to all counsel for your arguments. This is a sad case in GB's case. There's no time left. You have to talk to your partner and your – Oh, I apologize. I thought we had used the whole time up. You're all set then. Madam Clerk saved you. Thank you. She also saved an office fight. That's right. Well, I apologize for my misunderstanding. Sorry about that. You did look shocked when I said that. Thank you, Your Honor. Again, Mark Kimball, working with James Ware of my office on this case. So a question was posed as to whether or not deliberate indifference really is a determination of fact or maybe mixed fact and mixed law, and I think it is. And I think it is something that can only be resolved by a jury focusing specifically on some language from what I think we all would acknowledge is probably the most relevant case to this, to what's going on here today, is the Tomas case. And in Tomas, on the issue of qualified immunity, the court actually wrote, in determining whether officials are entitled to qualified immunity, we inquire, one, whether the facts taken in the light most favorable to the party asserting the injury show that the officer's conduct violated a constitutional right, and two, if so, whether the right was clearly established such that a reasonable official would understand that his conduct violated that right. So if we're getting into the realm of what a reasonable official would understand, that's an objective standard. And a reasonable official, that's a determination of fact, and that's something that has to be made by the jury in this case. But, Your Honor, I want to go a little bit farther on this issue because there's been a question raised about does policy rise to the level of a denominator of what a person's obligations are. Well, I don't think there's a question about it. I'm only citing what the law is, and I'm saying, come on. If that is not, if that is a violation, a mere violation of policy doesn't equate to deliberate indifference, I've got to have more than that. And, Your Honor, I understand the body . . . And all I'm trying to do is say don't rest on this violation of policy because that's not going to make it. I can easily, based on case, say you lose. I'm aware of the case law that says policy does not determine what is a constitutional right. I'm well aware of that. Good. But what I think that the reason why it's been cited in this case and why I think it's relevant, and this goes, again, squarely to the heart of the issues which relate to an FRCP 56 motion, when you have policy established and then we look at what are the obligations, what are the tests to be applied for this indifference test, then I think it becomes relevant. And I think when you look at . . . Wait a minute. I'm sorry? My colleague has pointed out there's a case that controls whether policy covered it. From my perspective, and I think you've kind of gathered it from our questioning, if you look at the specific facts of what these folks knew in terms of any statute or ordinary kinds of things, in some cases, they weren't even involved when things occurred. So it seems like policy is your whole case, basically. And my colleague has pointed out there is a case that suggests that that will not bring you to the level that you need in a constitutional issue like this. Why is he wrong? He's not wrong. What I am arguing is not that policy sets any kind of constitutional standard. That's not what I'm arguing at all. What I am suggesting is that when you look at the language in the Tomas case, and also in would-be Ostrander, but particularly in Tomas because that is so recent and it is so dealing with the very issues in front of the court, is that when we are looking at whether or not a person reasonably did what they needed to do, whether there . . . With respect, I'm just looking at my notes here. In Tomas, this occurred over approximately 10 years. The DSHS official responded to almost 40 or 30 formal and informal complaints regarding the Frabregas interaction with his foster children. That's a massive record, massive amount of information that would suggest there was a problem. You don't have that here. You just don't have it. Your Honor, if we were at trial, I think that argument would be very, very persuasive. But we're not at trial. This was a dismissal in which all of the inferences have to be resolved in favor of the non-moving party. Okay, let's do that. Let's just assume that they violated the policy. No courtesy as supervision, no setting up a home study. What is the evidence that there's an objective risk of serious harm to GB? So if I can quote the language from Tomas in response . . . Well, I don't need Tomas because I know what the law is. What is the evidence here that there was an objective risk of serious harm to GB if I just assume that they violated the policy? So in our brief at page 13, if I'm not mistaken, we outlined the problems. We outlined the risks. We outlined what Kirkland did. If I have looked at 13, is that all you want me to look at? Page 13. Because I was looking very seriously. I was saying to myself, that's why I outlined what these people did and when. And I said to myself, what is there here that's evidence of objective risk of serious harm? Every time anybody went out there to see this problem, there was never a concern about GB's safety. Never. Not from Desmond. Not from Vance. Not from Steiner. Not from Koss. Not from anybody. Responding to your question, on page 13 of our opening brief in the Kirkland matter . . . That's all you want me to read. I've read it. Okay. If that's your answer, I got that down. We outlined nine points of things that Kirkland . . . You're over time, so just wrap up, if you will, please. So, our argument is principally that policy doesn't change the constitutional standard. But, what it does do, is it informs whether or not an official's actions were reasonable. It's not the only determinant of that, but it informs it. And, for purposes of FRCP 56 . . . Excuse me. That information leads to an inference that cannot be overcome for purposes of the two motions that were granted. Okay. Thank you. Thank you very much to all counsel for your argument. The cases, the consolidated cases just argued, are submitted.
judges: M. Smith, Jr., N.R. Smith, Bress